IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
February 10, 2005 Session

# IN THE MATTER OF J. L. E.

**Appeal from the Juvenile Court for White County**
**No. JU1599; F2186     Sam Benningfield, Jr., Judge**

---

### No. M2004-02133-COA-R3-PT - Filed June 30, 2005

---

This is a mother's appeal of the termination of her parental rights to her son. After the Tennessee Department of Children's Services took custody of her son, it prepared a permanency plan requiring Mother to obtain therapy and case management services and perform other remedial tasks within approximately twelve months. After only six months, however, the Department filed a petition to terminate the mother's parental rights, and the court terminated her rights. Mother appeals claiming, in pertinent part, that the Department did not make reasonable efforts to reunite mother and son and that the Department did not prove by clear and convincing evidence that Mother committed severe child abuse. We have determined that the Department has failed to prove a ground for termination by clear and convincing evidence and, consequently, the judgment of the trial court must be reversed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Reversed**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which WILLIAM B. CAIN and FRANK G. CLEMENT, JR., JJ., joined.

Elizabeth Earl McDonald, Sparta, Tennessee, for the appellant, T. E. E.

Paul G. Summers, Attorney General and Reporter; Juan G. Villasenor, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

### OPINION

#### I. FACTUAL AND PROCEDURAL HISTORY

T.E.E. ("Mother") is a seventh grade educated, mildly mentally retarded woman who, at the time of the hearing, was 41 years old. Mother has suffered several nervous breakdowns in the past resulting from childhood sexual and physical abuse. During the last several years, Mother has not had legitimate employment and has a history of using illegal drugs. Although at times it is difficult

to decipher the chronology of events from the record, the basic facts are not at issue between the parties.

The Department of Children's Services ("DCS") had been working with Mother since her son ("Child") was born in 1995. Between 1995 and 2002, Mother and DCS had three plans of action with Child remaining in Mother's custody. The plans of action concerned drug use by Mother with the resulting risk of exposing Child to drug related environments and physical and educational neglect of Child from a lack of supervision and a stable home. During this period of time, Mother failed to comply with parts of the plans dealing with alcohol & drug assessments, treatment and stable housing. During this early period, Mother also apparently refused to accept services from Family Support Services.

In May of 2002, DCS filed a petition for temporary custody alleging Child to be dependent and neglected. Due to excessive absences from school, Child was to repeat kindergarten for the third time. The petition alleged that Child had not had a stable home for the preceding three years. On September 20, 2002, the juvenile court entered a consent decree reflecting that Mother and DCS had agreed to a Court Ordered Safety Plan ("Safety Plan") designed to allow Child to remain in his Mother's custody. Testimony and later court documents refer to this consent decree or Safety Plan, but it does not appear in the record before us. Apparently, the Safety Plan required Mother to undergo alcohol and drug assessment, a psychological assessment, a parenting assessment and to follow through with recommendations resulting from these assessments. With regard to the living environment, the Safety Plan required Mother to maintain stable housing and provide a safe, clean, drug free living environment for Child. Child remained in Mother's custody.

While the Safety Plan was in effect, Mother received several types of services from DCS. In November of 2002, DCS assigned this family to family support services manager, Carrie Mayberry, with Upper Cumberland Service Agency. At the termination hearing, Ms. Mayberry testified that prior to November 2002, Mother had participated in several programs to address her parenting issues. Mother had received alcohol and drug treatment through the Intensive Outpatient Drug Abuse Program provided by the Wellness Center in October of 2002, where she received her certificate for successful completion. Mother had received parenting assessment through Kid's First, Inc., and three months in-home, one-on-one parenting skills training that she also completed, including a therapeutic mentoring program to address Child's needs. Mother also received random drug screens.

Ms. Mayberry testified that while she had the case between November of 2002 and June of 2003, she discussed with Mother that she needed psychological treatment. Mother attended one appointment at Plateau Mental Health Center ("Plateau"), but Ms. Mayberry was contacted by the counselor at Plateau who told Ms. Mayberry that she was not qualified to treat Mother. Ms. Mayberry testified she gave Mother the phone number of Plateau and, although Mother did not have a phone, she told Ms. Mayberry it was not a problem since the neighbors let her use their phone. Mother testified that she had been to Plateau at different times in her life and seen different doctors and counselors, but had never been satisfied with their services. Ms. Mayberry testified that during

this period between November of 2002 and June of 2003, Mother was not compliant with the drug tests provided by DCS and that Mother admitted drug use to her.

As part of the Safety Plan, in January of 2003, Mother was referred by Ms. Mayberry to Scott Herman, a psychological examiner and licensed professional counselor, for a complete psychological assessment. Mr. Herman diagnosed Mother as having post-traumatic stress disorder, recurring depression and mild mental retardation. He concluded that Mother was capable of accomplishing most of the activities of daily life and usually may live independently. According to Mr. Herman, her retardation, however, will make it difficult for Mother to "comprehend and resolve new and complex situations." Mr. Herman believed her substance abuse problems arose from her attempt to self-medicate an emotional problem. At the time of her interview with Mr. Herman, she had been on prescription medications for depression for four or five years. At the time of the psychological evaluation, Mr. Herman testified he had concerns for Child's safety in Mother's care. Given the situation, Mr. Herman testified he believed Mother and Child were vulnerable to victimization.

As a result of Mr. Herman's interview of Mother, he recommended that Mother be referred to receive, among other things, the following services: (a) mental health case management to assist her in securing appropriate psychological treatment for herself, (b) psychiatric treatment, (c) psychological counseling, (d) assistance from an advocacy agency such as ARC, and (e) one-on-one training in managing attention deficit/hyperactivity (Child had been diagnosed with this condition), and implementing a behavior management plan for Child.

While at Mr. Herman's office for her evaluation, Mother reported to her DCS case worker that Child had been sexually molested by a neighbor's teenage son. By all accounts, Mother volunteered this information, did not try to hide the fact of this abuse, and was very upset by it.

In March of 2002 or 2003, the record is not clear about the year, Mother tested positive for methamphetamine and marijuana and failed to show for a follow-up drug screen in June of 2003.

On June 23, 2003, DCS filed a motion for temporary custody of Child, and by order entered that day and based on the sworn motion, the Juvenile Court removed Child from Mother's custody placing him in the court's protective custody. *See* Tenn. Code Ann. § 37-1-128(b)(2) (authorizing pre-hearing removal in certain circumstances). Temporary custody of Child was placed with DCS. The court removed Child from Mother's custody because it found there was probable cause, based on the filings, to believe she failed to substantially comply with the Safety Plan. The juvenile court found that there was probable cause to believe that Mother had failed to follow up on the recommendations by Mr. Herman resulting from her psychological evaluation, was about to lose her housing, continued to associate with known drug users at her residence, and admittedly continued to use illegal drugs. A hearing was set for the same day, but the record before us makes no reference

to such a hearing.[1]  An adjudicatory hearing was held August 26, 2003, but the order from that hearing was not entered until February of 2004.  *See* Tenn. Code Ann. § 37-1-129(a) (governing adjudicatory hearings in dependent and neglect cases).

As required by Tenn. Code Ann. § 37-2-403, in July of 2003 DCS prepared a Permanency Plan.[2]  The Plan was approved by the juvenile court on August 26, 2003.  Neither Mother nor any caseworker signed the Plan and there is no indication a staffing took place or who participated in it. The stated goal of the Plan was to return Child to Mother, and the projected date to reach this goal was June 17, 2004, one year from the date the Plan said the goal was established.  As is customary and required, the Permanency Plan assigned tasks to each party, including Mother, and stated the desired outcome for each task.  In addition, the Plan set an "expected achievement date" for each responsibility assigned to Mother, and that date was set at June 17, 2004.

According to the Plan, Mother was expected to obtain and complete mental health case management, ARC services, vocational rehabilitation, one on one parenting training, substance abuse treatment, drug screens, training on the prevention of Child sexual abuse; and mental health counseling.  She was also required to demonstrate lifestyle changes, establish a means of legal income, obtain and maintain stable and suitable housing, complete parenting assessment and parenting training, attend Child's school events and meetings, acknowledge and accept responsibility for the physical abuse she inflicted on Child[3], participate in counseling that addresses this physical abuse, complete an A&D assessment and treatment, and submit to random drug screens.[4]

In August of 2003, Angie Bullock became DCS case worker assigned to this family.  The record is not clear whether Mother had any contact with a DCS case worker prior to Ms. Bullock but after Child's removal.  (Mother did have contact with DCS representatives who were assisting her son).  This period is critical since it is at least 2 of the 6 months Mother ultimately was given to meet the requirements of the Permanency Plan.

According to Ms. Bullock, although she was not the caseworker at the time, in July of 2003, Mother was given phone numbers of mental health counselors that accept TennCare to begin individual counseling.  The record reflects that "someone" took Mother to one such appointment, but due to a change in Mother's TennCare benefits, the doctor would not see Mother.  There were

---

[1] Presumably, this hearing was intended to be the preliminary hearing required by Tenn. Code Ann. § 37-1-117(c), which must be held if the child is not returned to the parent within three days.

[2] Actually there were two Permanency Plans, dated July 17 and 23 of 2003 respectively.  The terms relevant to these proceedings are basically the same in both plans, and the later plan addresses Child's therapeutic foster care needs. Our reference will be to the later Permanency Plan dated July 23, 2003.

[3] This requirement related to an incident in which Ms. Mayberry visited Mother's home, heard screaming before she entered, and observed a welt on Child's back.  Mother testified about this incident, describing it as an aberration from her usual methods of dealing with Child.

[4] A number of these tasks appear to have been completed before the Plan was prepared.

bi-weekly visits between Child and Mother conducted by a behavioral specialist with Youth Villages. DCS provided transportation for Mother to visit Child and to some medical/dental appointments. In September of 2003, Ms. Bullock assisted Mother in filing for social security disability benefits due to her mental and physical health problems. At this time she also offered to request funds to assist Mother in getting suitable housing.

In October of 2003, after a referral from DCS, Mother saw a physician at Plateau and was prescribed psychotropic medication. Mother, however, did not schedule follow-up appointments with the doctor at Plateau. She experienced problems with her medication; it made her feel bad and caused her to sleep a great deal. She later went to another doctor who took her off most of the medications that had been prescribed. She improved. In November of 2003, Ms. Bullock sent Mother a letter with information about a follow up appointment at Plateau and case management services. Mother did not remember receiving this letter. From the record, it appears that Mother did not have a stable residence during this time and no dependable mailing address.

In January of 2004, Ms. Bullock took Mother to a shelter for abused women. Before this, Mother had been living with the family of the boy who had abused Child and with her mother and her mother's abusive boyfriend. Less than three weeks later, Mother was required to leave the shelter for failure to comply with her plan at the shelter.

Seven months after taking Child into custody, six months after preparation of the initial permanency plan, and five months after the court approved that plan, on January 30, 2004, DCS filed its Petition to Terminate Parental Rights of Mother. It is not clear from the record why DCS filed its petition five months before the period established in the Permanency Plan expired. Presumably DCS filed at this early juncture because it did not believe Mother was making sufficient progress under the Permanency Plan. DCS sought to terminate Mother's rights on the following grounds: (1) abandonment under Tenn. Code Ann. § 36-1-113(g)(1); (2) substantial non-compliance with Permanency Plan under Tenn. Code Ann. § 36-1-113(g)(2); (3) persisting conditions that prevented the Child's return to the home after six (6) months in foster care, under Tenn. Code Ann. § 36-1-113(g)(3); (4) severe child abuse as defined by Tenn. Code Ann. § 37-1-113(g)(4); and (5) parental incompetence under Tenn. Code Ann. § 36-1-113(g)(8).

Shortly thereafter, DCS prepared a new permanency plan with a goal of adoption. The revised plan was presented to Mother at a staffing on February 5, 2004. Mother signed, acknowledging that plan had been discussed with her, but specifically disagreed with the plan. A number of people who attended the staffing also signed the Plan indicating their participation. Mother also, on February 5, 2004, signed an acknowledgment that she had received a copy of "Criteria & Procedures for Termination of Parental Rights" and been given an explanation of its contents. That document lists the grounds for termination of parental rights. Ms. Bullock signed the document stating she had explained it to Mother on February 5, 2004. The revised plan was approved by the juvenile court by order entered March 30, 2004. The termination petition had been heard shortly before this order was entered.

In support of its motion for the court to ratify the revised plan, DCS submitted an Affidavit of Reasonable Efforts supplied by Ms. Bullock. The affidavit recounted services that had been provided under the Safety Plan before June 20, 2003 and services that had been provided from Child's removal on June 20, 2003, to date, February 17, 2004.

Meanwhile, on February 17, 2004, the trial court entered an Adjudicatory and Dispositional Hearing Order reflecting the result of the August 26, 2003, hearing on DCS's motion for temporary custody that had been filed in June of 2003. *See* Tenn. Code Ann. § 37-1-129(a). The court found Child was dependent and neglected.

The trial court held a hearing on DCS's petition to terminate Mother's parental rights in March of 2004. Among those who testified at the hearing were Ms. Mayberry, Ms. Bullock, Mr. Herman, Child's foster mother, Mother and two friends. At the hearing, Mother testified about several adjustments she had recently made in her life. She testified she had a job[5], had applied for public housing, was living with a female friend until public housing became available, had stopped using drugs and associating with drug users, and had an appointment for the day after the hearing at Life Care, apparently for case management services and counseling. It was clear that Mother's friend had assisted her in several areas, including looking for housing.

In July of 2004, the trial court entered a Final Decree of Guardianship finding that DCS had proved by clear and convincing evidence that grounds for termination of parental rights existed under Tenn. Code Ann. § 36-1-113(g)(1), (2), (3), and (4) and that it was in Child's best interest to terminate Mother's parental rights.[6] The court found that DCS had made reasonable efforts to reunite Mother with Child. The trial court refused to terminate Mother's rights on the grounds that she was not competent under Tenn. Code Ann. § 36-1-113(g)(8), finding that she had the ability to care for Child.

On appeal, Mother focuses on five (5) specific findings by the trial court that Mother claims were in error: (1) that DCS provided the necessary reasonable efforts to reunite Mother and Child; (2) that there was little likelihood of conditions being remedied so that Child could return home; (3) that Mother had committed severe Child abuse; (4) that termination is in Child's best interest; and (5) that Mother was financially capable of paying Child support.[7]

---

[5]Although the assignment Mother was working on was temporary in duration, she testified her employer had told her he would give continue to give her assignments providing care to elderly or sick persons.

[6]This order also terminated the parental rights of Child's father. The father did not participate in the proceedings below and filed no appeal.

[7]Because of our resolution of the primary issues, we do not address all issues raised by Mother.

## II. STANDARD FOR TERMINATION OF PARENTAL RIGHTS

A court may terminate a person's parental rights only if (1) the existence of at least one statutory ground is proved by clear and convincing evidence and (2) it is shown, also by clear and convincing evidence, that termination of the parent's rights is in the best interest of the child. Tenn. Code Ann. § 36-6-113(c); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The higher evidentiary standard, as well as procedural safeguards, exist to prevent unwarranted government interference with a parent's fundamental and constitutionally protected right to the care and custody of his or her children.[8] Because of the severity of the consequences of a decision to terminate parental rights,[9] such proceedings must insure protection of that right.

Our legislature has identified those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought. Tenn. Code Ann. § 36-1-113(g). The statutes on termination of parental rights provide the only authority for a court to terminate a parent's rights. *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004). Thus, parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). To support the termination of parental rights, only one ground need be proved, so long as it is proved by clear and convincing evidence. *In the Matter of D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003).

The requisite higher standard of proof applicable to both grounds and best interest is one of the safeguards necessitated by the severity of the interference with the parent's fundamental rights. In order to be clear and convincing, evidence must eliminate any serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). Such evidence should produce in the fact-finder's mind a firm belief or conviction as to the truth of the allegations sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *In re C. W. W.*, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000). In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is "highly probable" as

---

[8] A parent has a fundamental right to the care, custody and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 1212-13 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn.1996); *In Re Adoption of a Female Child*, 896 S.W.2d 546, 547 (Tenn.1995); *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn.1994). This right is a fundamental but not absolute right, and the state may interfere with parental rights if there is a compelling state interest. *Santosky v. Kramer*, 455 U.S. 745, 747, 102 S. Ct. 1388, 1391 (1982); *Nash-Putnam*, 921 S.W.2d at 174-75.

[9] Terminating parental rights has the legal effect of reducing the parent to the role of a complete stranger, "severing forever all legal rights and obligations of the parent." Tenn. Code Ann. § 36-1-113(*l* )(1). The United States Supreme Court has recognized the unique nature of proceedings to terminate parental rights, stating that "[f]ew consequences of judicial action are so grave as the severance of natural family ties." *M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S. Ct. 555, 565 (1996) (quoting *Santosky*, 455 U.S. at 787, 102 S. Ct. at 1412 (Rehnquist, J., dissenting)). As a result, "[t]he interest of parents in their relationship with their children is sufficiently fundamental to come within the finite class of liberty interests protected by the Fourteenth Amendment." *Id.*

opposed to merely "more probable" than not. *In re C. W. W.*, 37 S.W.3d at 474; *see also Estate of Acuff v. O'Linger*, 56 S.W.3d 527, 537 (Tenn. Ct. App. 2001).

Due to the grave consequences that accompany such decisions, courts must apply individualized decision-making to a termination decision. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999). Due process requires the application of stringent standards to insure protection of the fundamental rights at stake. Because of the constitutional implications, gravity of consequences, higher standard of proof, and required individualized decision making, our legislature has explicitly required that courts making termination of parental rights decisions "enter an order which makes specific findings of fact and conclusions of law." Tenn. Code Ann. § 36-1-113(k). In this court's review, we must determine *de novo* whether DCS sustained its burden to prove its case by clear and convincing evidence. *In re Valentine*, 79 S.W.3d at 546.

### III. ABANDONMENT

Among the grounds alleged by DCS in its petition, and found by the trial court to have been shown, was abandonment, as defined by a specific subsection of the statute defining that term:

> . . . and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date.

Tenn. Code Ann. § 36-1-102(1)(A)(ii).

The General Assembly has established requirements for the type of notice that must be given a parent as a prerequisite to proceedings to terminate on the ground of abandonment. Tennessee Code Annotated § 37-2-403 establishes requirements for a permanency plan for a child placed in foster care. It also establishes requirements for notice to parents of the definition and potential consequences of "abandonment" as that term is defined in Tenn. Code Ann. § 36-1-102.[10] First, that definition and the potential and procedures for termination of parental rights are to be included on the initial permanency plan itself, which is to be signed by the parent. Tenn. Code Ann. § 37-2-403 (a)(2)(A). Second, at the hearing on the court's consideration of the permanency plan, the court "shall explain on the record the law relating to abandonment contained in § 36-1-102." Tenn. Code Ann. § 37-2-403 (a)(2)(B)(i). If the parents are not present at the first hearing, the court is to make the required explanation at any subsequent hearings. *Id.*

---

[10]Tenn. Code Ann. § 37-2-403 includes specific requirements about notice of failure to support or failure to visit, referring to other statutory definitions of abandonment, but the statute's repeated references to abandonment as defined in § 36-1-102 make it clear that the notice requirements apply to all definitions of abandonment.

If the parents do not appear at permanency plan hearings or cannot be provided notice of such hearings, DCS may still proceed to terminate parental rights on the ground of abandonment "under § 36-1-102" only if DCS demonstrates specified things at the time of the termination proceeding. Tenn. Code Ann. § 37-2-403 (a)(2)(B)(ii). Those showings are:

*(a)* That the court record shows, or the petitioning party presents to the court a copy of the permanency plan or plan of care that shows that the defendant parents or legal guardians, subsequent to the court review in subdivision (a)(2)(B)(i), has signed the portion of the permanency plan or plan of care which describes the criteria for establishing abandonment under § 36-1-102, or that the court record shows that, at a subsequent hearing regarding the child, the court made the statements to the parents or legal guardians required by subdivision (a)(2)(B)(i).

*(b)* By an affidavit, that the child's permanency plan or plan of care containing language which describes the criteria for establishing abandonment under § 36-1-102 was presented by the agency party to the parents or guardians at any time prior to filing the termination petition, or that there was an attempt at any time to present the plan which describes the criteria for establishing abandonment under § 36-1-102 to the parents or guardians at any time by the agency party, and that such attempt was refused by the parents or guardians.

*(c)* That, if the court record does not contain a signed copy of the permanency plan or plan of care, or if the petitioning agency cannot present evidence of a permanency plan or plan of care showing evidence of such notice having been given or an affidavit showing that the plan was given or that the plan was attempted to be given to the parents or guardians by the agency and was refused by the parents or guardians, and, in this circumstance, if there is no other court record of the explanation by the court of the consequences of abandonment and the right to seek an attorney at any time, then the petitioning agency shall file with the court an affidavit in the termination proceeding which describes in detail the party's diligent efforts to bring such notice required by subdivision (a)(2)(B)(i) to such parent or guardian at any time prior to filing the agency's filing of the termination petition.

Neither of the two initial Permanency Plans in the record reflects Mother's signature or that of the case worker who prepared the Plans. Specifically, the Plans have a separate section, entitled "Agreements and Signatures" which consists of various statements that the parent is supposed to sign indicating agreement, *e.g.*, "The Permanency Plan has been discussed with me;" "I agree with the Permanency Plan;" and "I have been provided with a written copy of my appeal rights." No signature appears in any of these spaces. In addition, there is a place for all participants in the staffing to sign. No signatures appear in that space. Mother's signature does not appear anywhere on the Plans, nor is there any indication she refused to sign. There are simply no signatures of anyone who should have been involved in the development of the Plans and their staffing. In addition, neither of the Plans contains the notice required by Tenn. Code Ann. § 37-2-403(a)(2)(A).

At the termination hearing, the only DCS worker called as a witness was Angie Bullock, who was the case manager assigned to this family in August of 2003. Ms. Bullock testified that she did not staff the July plans. Consequently, she could have no personal knowledge about the staffing, whether Mother attended, why there were no signatures on the plan, and even whether or when Mother was given a copy of the plan or given the required explanation of abandonment and its potential consequences. Further, there was absolutely no evidence that Mother was told in June or July that she had only four months from Child's removal to find suitable housing or would face termination of her parental rights.

Mother testified she was generally aware of the Plan's requirements, but was not asked whether she had attended a staffing in July when the plan was prepared, or whether the DCS worker had, at that staffing, explained to her the definition of abandonment or the consequences of conduct meeting that definition. She also was not asked if she was ever informed that her failure to establish a suitable home within four months of child's removal could result in termination of her parental rights. It is obvious from her other testimony that she knew she had to work on all aspects of the Plan, perhaps because of the pre-removal Safety Plan and pre-removal discussions with DCS, but had no idea that DCS considered her deadline for housing to be October of 2003.

The July 23 Permanency Plan was approved by the court on August 26, 2003. Although the court's signature affirms that the approval was based on evidence presented in support of the plan and with "all parties having the opportunity to be heard," nothing in the record before us indicates when a hearing was held or that the court provided the explanations set out in Tenn. Code Ann. § 37-2-403 (a)(2)(B)(i).[11] Consequently, there is no evidence of the type required by the statute that, prior to DCS filing its petition for termination, Mother was given notice of the definition of abandonment relied upon by DCS or the fact that DCS could use that definition to terminate her parental rights.

The notice provisions of the statute are designed to inform parents, before they engage in conduct constituting abandonment, of the potential consequences of that conduct. Otherwise, it has no real purpose. With regard to the definition of abandonment occurring in the first four months after the child is removed from the home, that notice would need to be given quickly and clearly. If a parent is notified after the fact, *i.e.*, after the four months has run, he or she has no way to avoid the consequences and cannot remedy the situation. In that situation, the purpose of the notice requirements is not fulfilled.

As discussed earlier, DCS prepared a new, revised permanency plan in February of 2004, after it had filed its petition to terminate Mother's parental rights. That plan recognized DCS's change of opinion regarding Child's future placement and set the goal as adoption. That plan was signed by Mother, although she indicated her disagreement with it, and she acknowledged in writing that the plan had been discussed with her and that she had received written notice, and an explanation, of the

---

[11]There was a hearing held August 26, 2003, but the only order in the record referring to that hearing describes it as an adjudicatory hearing on DCS's petition to remove child from Mother's home. That order indicates Mother was present at the hearing. The order makes no mention of the Permanency Plan.

definition of abandonment and the criteria and procedures for termination of parental rights. Obviously, notifying Mother in February of 2004 that her failure to establish a suitable home by October of 2003 constituted grounds for termination in a petition that had already been filed does not meet the statutory requirement of notice.

In determining whether the notice requirements have been met, we must also examine one additional aspect of the testimony. Ms. Bullock testified that at a "staffing" sometime after the original plan's staffing, she went over the plan's requirements with Mother and told her that if she failed to comply with the requirements, DCS would file to terminate Mother's parental rights. However, Ms. Bullock could not state exactly when that staffing occurred, saying only that it had occurred "a few months ago." This testimony took place on March 16, 2004, so the conversation described by Ms. Bullock could have occurred after the filing of the petition to terminate Mother's parental rights. This testimony also indicates that Mother was given the required notification after the four months had expired, *i.e.*, after October of 1993.

Ms. Bullock's use of the term "staffing" makes it more likely that she was referring to the staffing related to the February 5, 2004, revised Permanency Plan since on that date she also signed a statement that she had explained the contents of the "Criteria & Procedures for Termination of Parental Rights" to Mother. Of course, that staffing related to the Plan that had as its goal the adoption of Child, and the written notice and explanation were given to Mother after the petition to terminate were filed. The petition was based in part on Mother's alleged noncompliance with the July 2003 plan.

DCS did not make or attempt to make any of the other showings required in the absence of proof in the record that the parent was advised in accordance with Tenn. Code Ann. § 37-2-403. It did not file the affidavit mentioned in Tenn. Code Ann. § 37-2-403(a)(2)(b)(ii)(c).

Consequently, DCS has failed to show that Mother was given the notice required by Tenn. Code Ann. § 37-2-403 and, as a result, was precluded from proceeding to terminate Mother's rights on the ground of abandonment. We reverse the trial court's holding as to the ground of abandonment.

As the language of the statutory definition set out above makes clear, the type of abandonment relied on by DCS requires DCS to make reasonable efforts, within the same four month period, to assist the parent to establish a suitable home. This court has previously examined the efforts made by DCS as required under the relevant definition of abandonment and found them lacking. *See In re M.J.M.*, No. M2004-02377-COA-R3-PT, 2005 WL 873302, at *7 (Tenn. Ct. App. April 14, 2005) (no Tenn. R. App. P. 11 application filed). We reach the same conclusion here. It is not clear that any caseworker was responsible for assisting Mother during the first two months after child's removal. The new caseworker's efforts as to housing from August through October apparently consisted of offering to request funding to help with deposits, etc. and giving Mother the necessary paperwork to complete. While such help would not have been inconsequential, it is not clear what other assistance, if any, was provided to Mother to help her locate housing or navigate the public housing system. It is also unlikely that had Mother completed the paperwork when it was given to

her she would have been able to secure housing before the expiration of the four months. DCS knew Mother would have difficulty with new and complex situations and was without transportation during much of the relevant time period. DCS's action to get Mother into a shelter occurred in January, well after the four month period involved in the abandonment alleged.

## IV. REASONABLE EFFORTS

The trial court found that DCS had also proved the grounds of substantial non-compliance with requirements of the Permanency Plan and the persistence of conditions that, after six months in foster care, prevented Child's safe return to Mother's home. Mother argues that DCS failed to use reasonable efforts to assist her in meeting the requirements of the Plan and remedying the conditions that led to Child's removal.

DCS had a long involvement with this parent and child before it removed Child from the home. After that removal, DCS apparently still believed that reunification of the family was in the best interest of Child. Accordingly, it established Child's return to Mother as the goal of the Permanency Plan. Because of that stated goal, and because of its statutory responsibility, DCS was required to use reasonable efforts to make it possible for the child to return home to Mother. While a Permanency Plan establishes responsibilities for the parent(s), it also establishes responsibilities for DCS.

A Permanency Plan with the goal of reunification is designed to address the situation and problems that led to a child's removal from home. There is a connection or relationship between the circumstances occurring in the home that required removal and the requirements of the Plan. Herein, the parties do not dispute that the requirements of the Plan were reasonably related to remedying the conditions preventing Child from returning home. If the requirements of a Plan with the goal of reunification are met, presumably the conditions that led to the removal no longer exist or no longer prevent the safe return of the child to the home. Thus, the statutory grounds of substantial noncompliance with the permanency plan and persistence of conditions (when the conditions alleged are those that led to removal) are related. Often, the same issues and proof are involved with both grounds. Additionally, with both grounds, the parent's compliance with the requirements of the Plan and ability to remedy conditions preventing the child's safe return home are inextricably related to, and often dependent upon, the efforts of DCS to assist the parent. *See In re C.M.M.*, 2004 WL 438326, at *7.

There are two periods of time relevant to DCS's obligation to use reasonable efforts. The first is before the child is removed from the home. At any hearing to grant custody of a child to DCS, DCS must demonstrate, and the court must determine, that DCS used reasonable efforts to prevent the need for removal of the child from his or her family. Tenn. Code Ann. § 37-1-166(a)(1) and (g)(2)(A). The second period of time is after removal, when, as a general rule, DCS must use reasonable efforts to return the child home.

-12-

In the case before us, Child was removed from the home on June 17, 2003, and a temporary custody order was entered June 23. The basis for removal was the court's finding there was probable cause to believe Mother had not substantially complied with the previously entered Safety Plan. The petition was accompanied by an Affidavit of Reasonable Efforts signed by Beth Mabe, a case manager with DCS. She recounted various services that had been provided to the family up to the date of filing.

An Adjudicatory and Dispositional Hearing Order was entered February 17, 2004, reflecting that an adjudicatory hearing was held August 26, 2003, on the June 23 petition. Mother was present at this hearing and represented by counsel. Based in part on the parties' stipulation that Child continued to be dependent and neglected and that DCS should retain temporary custody for placement in foster care, the trial court found Child dependent and neglected and ordered that DCS retain temporary custody. In addition, based on stipulations, evidence presented, and the entire record, the court found:

> that there is no less drastic alternative to removal; reasonable efforts have been made to prevent removal and/or to make it possible for the child to return home; and continuation of the child in the parent or legal guardian's custody is contrary to the best interest of the child.

With regard to reasonable efforts, the trial court specifically found that DCS had provided intensive services to Mother and Child for more than a year, including arranging a psychological evaluation for Mother, providing counseling to the child, providing a parenting assessment and training for Mother, and arranging an alcohol and drug assessment and treatment for Mother. "Despite these services the mother has continued to neglect the child as is more fully set out in the Motion for Temporary Custody filed on June 23, 2003."

The result of all this is that DCS was found to have provided reasonable efforts to prevent removal of Child from the home. No appeal was taken from the court's February 17, 2004 Adjudicatory and Dispositional Order. DCS's efforts before removal of Child are not at issue in this appeal.

The relevant question is whether DCS made reasonable efforts after Child's removal to assist Mother so that Child could be returned to Mother's custody.[12] After a child is removed from the parent's home, absent specified circumstances not relevant herein, DCS is also required to use reasonable efforts to reunite the family. Tenn. Code Ann. § 37-1-166 (g)(2); *In re C.M.M.*, 2004 WL 438326 at *6.

_____

[12]DCS concedes in its brief that while the efforts of DCS to work with Mother prior to the court's removal of Child from Mother's custody in June of 2003 may be "probative of DCS's good will," the key question is DCS's efforts post-removal.

Despite its earlier determination that Mother had not substantially complied with the terms of the prior Consent Order that allowed Child to remain with Mother, and its determination that removal of Child was necessary in June of 2003, DCS developed a Permanency Plan with the goal of returning Child to Mother. The requirements the Permanency Plan assigned to Mother were similar to those established in the earlier Consent Order or Safety Plan. Nonetheless, DCS apparently determined that Mother should be given more time (until June of 2004) to reach the desired goals and that she was capable of doing so with appropriate assistance.

Once DCS undertakes the obligation to use reasonable efforts to reunify a family, courts should employ the standard of clear and convincing evidence to determine whether DCS's efforts have been reasonable. *In re C.M.M.*, 2004 WL 438326 at *5.[13]

> When required, DCS must establish that it has made reasonable efforts to reunite the child with his or her parents by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c). This heightened burden of proof does not alter the standard by which the Department's efforts will be judged – the "reasonableness" standard. Rather, it simply requires the Department to present sufficient evidence regarding its reunification efforts to enable the trier-of-fact to conclude, without any serious or substantial doubt, that the Department's remedial efforts were reasonable under all the circumstances.

*Id*. at *8.

Reasonable effort has been defined by our legislature to mean "the exercise of reasonable care and diligence by DCS to provide services related to meeting the needs of the child and family." Tenn. Code Ann. § 37-1-166(g)(1). The factors to be considered in determining whether DCS has made reasonable efforts include, among others, the reasons for separating the parent from the child, the parent's physical and mental abilities, the resources available to the parent, and the parent's efforts to remedy the situation. *Id.* at *7.

The parties agree that a significant need of this mother was mental health services. The Safety Plan in 2002 recognized that in order for Mother to retain custody, she must undergo a psychological assessment and comply with the recommendations resulting from it. In January of 2003, Mother was assessed by Mr. Herman, and the resulting recommendation was for Mother to have mental health case management, psychiatric treatment, and psychological counseling. After Child was removed from Mother's custody, in July of 2003, the Permanency Plan cited as a key factor that Mother receive the counseling recommended by Dr. Herman. As recently as February of 2004, in its Affidavit of Reasonable Efforts supporting the revised Permanency Plan, DCS stated that in order to reunite the family Mother "needs to successfully complete individual counseling."

---

[13] In order to terminate parental rights on the grounds found in Tenn. Code Ann. § 36-1-113(g)(1)-(3), generally DCS must show that it has made reasonable efforts to reunite the child with his or her parents. *In re C.M.M.*, 2004 WL 438326 at *7, fn. 27.

Throughout this record, there is evidence that DCS and others believed Mother was competent to care for Child but needed the assistance afforded by case management, treatment, and counseling to be successful.[14] Both DCS and Mother cite portions of Mr. Herman's evaluation. As discussed earlier, Mr. Herman found Mother suffered from post-traumatic stress disorder and recurring depression and was mildly mentally retarded. He recommended that to address Mother's drug use, which he attributed to an attempt to self-medicate her depression, it was important to ensure "that she receives appropriate mental health treatment. . . . Obviously, she should continue to receive treatment from a psychiatric physician." He also noted that Mother "would likely benefit from individual psychotherapy" to address the symptoms from her mental health condition. Mr. Herman also stated that Mother was "experiencing high levels of anxiety and depression" due in part to her son's recent disclosure he had been sexually abused. Mr. Herman's observations were made several months before Child was taken into DCS custody, an event that would likely have added to Mother's anxiety and depression.

The disagreement is not about Mother's needs; rather, it centers around the sufficiency of Mother's efforts and those of DCS. DCS had the burden of proving, by clear and convincing evidence, that its efforts were reasonable and that Mother's were not, under the circumstances. We have thoroughly reviewed the record to ascertain DCS's efforts in this regard. First, we are troubled that DCS initially gave Mother a year in the Permanency Plan to meet the goals then petitioned to terminate rights after only six months. During the six month period between June of 2003 (when Mother lost custody) and January of 2004 (when DCS petitioned to terminate her parental rights), it does not appear Mother had a caseworker for the first two months of that period. While the Permanency Plan established a period of approximately one-year for Mother to accomplish its goals, DCS instead filed to terminate her rights after Mother had only a four month period with a caseworker. Therefore, Mother's period to improve was significantly abbreviated.

This court has expressed its concerns about DCS moving to terminate a parent's rights well short of the time allowed by the Permanency Plan for the parent to complete the responsibilities assigned to him or her, absent intervening or extraordinary circumstances. *See In re M.J.M.*, No. M2004-02377-COA-R3-PT, 2005 WL 873302 (Tenn. Ct. App. April 14, 2005). Those concerns are based on the fundamental unfairness inherent in providing the parent with notice of one set of expectations and acting inconsistently with that notice.

The assistance offered Mother during this six month period of the Permanency Plan to obtain all the services she needed in order to have any success in complying with the Plan was lacking. In July of 2003, DCS caseworkers gave Mother telephone numbers of therapists who accepted TennCare. Someone took Mother to one such appointment during this period, but Mother was refused treatment due to a change in her TennCare coverage. A DCS referral resulted in Mother seeing a physician at Plateau in October of 2003, who prescribed her psychotropic medication. While DCS tried to follow-up after this appointment, it took the form of a letter which Mother does

---

[14] Incompetency was included as a ground to terminate parental rights in DCS's petition but the trial court found Mother to be competent, and DCS does not challenge this decision.

-15-

not remember receiving.  Given the shifting residences of Mother, this is not surprising.  Mother herself attempted to set up counseling with Mr. Herman, but by that time he was working with Child and could not accept Mother as a patient.

While under some situations this effort may be perfectly reasonable, it is not reasonable here. Mr. Herman's assessment specifically diagnosed Mother as a mildly mentally retarded woman who would have difficulty comprehending and resolving new and complex situations.  She had been taken to mental health centers on two occasions in the past by her caseworkers and been refused service. The record is clear that during this time Mother had no friends or family offering support, and had limited transportation and mail or telephone access.  This court has not found it easy to identify the types of services Mother needed and the available sources for each of them.  We are unable to find that Mother should have been expected to know exactly what she needed, where she could obtain the services, and how to access the system.  Simply giving a mildly retarded woman in this situation phone numbers and sending her a letter does not meet the reasonableness standard:

> Reasonable efforts entail more than simply providing parents with a list of service providers and sending them on their way.  The Department's employees must use their superior insight and training to assist parents with the problems the Department has identified in the Permanency Plan, whether the parents ask for the assistance or not.

*In re C.M.M.*, 2004 WL 438326, at *7 (citation omitted).

In order for Mother to benefit from the other services offered to her, Mother needed case management, psychiatric treatment, and counseling.  This case is closely akin to the facts of *In re M.E.*, No. M2003-00859-COA-R3-PT, 2004 WL 1838179 (Tenn. Ct. App. Nov. 8, 2004).

> The record shows that the Department provided numerous services to Mother and the family, either directly or through agencies including Home Ties, YWCA, Dede Wallace, Staying Home and Coming Home, Caring For Children Program, and the Rape and Sexual Abuse Center.  However, the record reveals that the Department failed to provide the most obvious and essential service Mother needed, the mental health services recommended by Dr. Boggs.  The juvenile court recognized early on that Mother had mental deficiencies.  Indeed, the juvenile court twice ordered psychological evaluations for Mother.  On June 25, 1997, the court ordered the Department to provide a psychiatric evaluation for Mother.  The first evaluation was performed on July 15, 1997, but the report is not in the record.  Then on May 3, 2000, the court again ordered that a mental evaluation be performed on Mother with the "referral to be made by DCS and CSA."

. . .

-16-

Many important findings are set forth in the report by Dr. Boggs but two leap from the pages. One, Mother has "extreme difficulty understanding and processing information that is solely verbal in nature." Two, "It is recommended that [Mother] seek individual psychotherapy with a therapist who is effective in treating the dependent personality and its associated problems, (*e.g.*, depression, anxiety, fears of abandonment, etc.)."

It is troubling to note that the juvenile court ordered the Department to make the referral for Mother to have a second psychological evaluation, and the evaluation recommended individualized therapy, yet the therapy was not provided. Though the Department provided many services that would likely meet the criterion of reasonable services in some cases, by failing to provide the recommended psychological therapy, the services that were provided proved to be a waste of time and money.

*Id*. at *7.

Applying the clear and convincing standard required of us, we find that DCS did not meet its burden of proving that it made reasonable efforts to reunite Mother and Child. As a result, the juvenile court's finding that DCS established the grounds of failure to substantially comply with the Permanency Plan under Tenn. Code Ann. § 36-1-113(g)(2) and persistent conditions under Tenn. Code Ann. § 36-1-113(g)(3) must be reversed.

## V. SEVERE CHILD ABUSE

The trial court also found that the ground of severe child abuse had been proved. Mother argues that the record does not contain clear and convincing evidence of severe child abuse under Tenn. Code Ann. § 37-1-102. DCS has not responded to this argument and, in fact, has not addressed the trial court's severe child abuse finding. Consequently, DCS has effectively conceded the issue to Mother and has waived any argument in support of the finding. Thus, we need not deal with this issue in depth.

Nonetheless, we have reviewed the entire record, including in particular the testimony on which the trial court relied in making the finding. We conclude there was not clear and convincing evidence Mother committed severe child abuse as defined by Tenn. Code Ann. § 37-1-102 against Child. Presumably, DCS reached the same conclusion since it abandoned this ground on appeal. For these reasons, we reverse the trial court's finding that the ground of severe child abuse was proved to exist.

## VI. CONCLUSION

Because DCS failed to establish a statutory ground for termination of parental rights, we must reverse the judgment of the trial court.

The record before us includes evidence of Child's improvement in the stable environment of the foster home where he was placed as well as the excellent care he has received from his foster parents. We cannot reach the issue of Child's best interests because no ground for termination has been proved. However, our decision herein does not affect Child's placement or custody. The juvenile court retains authority over those issues. Child may remain in the setting that has proved beneficial to him, if the court so determines, until circumstances warrant a reconsideration.

The judgment of the trial court is reversed. We remand this case to Juvenile Court for White County. Costs of appeal are assessed against the appellee, The State of Tennessee, Department of Children's Services, for which execution may issue if necessary.

_____
PATRICIA J. COTTRELL, JUDGE